PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 17-2302

———————————

*THE ESTATE OF ADRIANO ROMAN, JR.,
                                        Appellant

v.

CITY OF NEWARK;
CITY OF NEWARK POLICE DEPARTMENT;
ANTHONY CAMPOS, Chief of Police;
RODGER C. MENDES;
ALBANO FERREIRA; ONOFRE H. CABEZAS;
JOSEPH CUETO;
FNU RESSUREICAO; FNU GOLPE; JOYCE HILL,
Individually and in their capacity as police officers;
JOHN DOES 1-20, as fictitious names for presently unknown
agents member commissioners and chiefs

*(Amended pursuant to Clerk's Order dated 1/25/18)

———————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-16-cv-01110)
District Judge: Honorable Susan D. Wigenton

———————————

Argued June 12, 2018

Before: AMBRO, JORDAN, and
HARDIMAN, <u>Circuit Judges</u>

(Opinion filed: January 29, 2019)

Justin D. Santagata          (Argued)
Kaufman Semeraro & Leibman
Two Executive Drive, Suite 530
Fort Lee, NJ   07024

        Counsel for Appellant

Kenyatta K. Stewart, Acting Corporation Counsel
Wilson D. Antoine          (Argued)
City of Newark–Department of Law
920 Broad Street, Room 316
Newark, NJ  07102

        Counsel for Appellees

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Newark police officers forcibly entered and searched the apartment of Adriano Roman's girlfriend. App. at 386, 391, 459, 486.  They arrested Roman, who was present in the apartment, after they found drugs in a common area that was shared by multiple tenants.  *Id.* at 399, 479.  Though he was imprisoned for over six months and indicted for various drug

offenses, the New Jersey Superior Court found the search to be unlawful and the charges were dropped.

Roman now brings claims against the City of Newark (which includes its Police Department) and various police officers under 42 U.S.C. § 1983 (which gives a federal remedy against state officials who, acting under color of state law, deprive "any citizen of the United States . . . of any rights, privileges, or immunities secured by the [U.S.] Constitution and laws") and New Jersey tort law. He alleges the City had a pattern or practice of constitutional violations and failed to train, supervise, and discipline its officers. He also pleads an unlawful search claim against the officers and contends they are liable for false imprisonment and malicious prosecution. The District Court dismissed all of the claims because they were inadequately pled. It also held the City did not have an ongoing practice of unconstitutional searches and arrests.

While most of Roman's claims do not withstand dismissal, his § 1983 claims against the City do. He has adequately alleged that its Police Department had a custom of warrantless searches and false arrests. He also sufficiently pled that the Department failed to train, supervise, and discipline its officers, specifically with respect to "the requirements of [the] Fourth Amendment and related law." App. at 160. Because Roman has stated a plausible claim against the City, we vacate and remand the District Court's holding on municipal liability. We affirm in all other respects.

## I.   Background[1]

On May 2, 2014, Roman and his girlfriend Tiffany Reyes were watching a movie in her apartment's bedroom. App. at 386, 389, 395.  Unbeknownst to them, four Newark police officers had set up surveillance outside of her building because of complaints about narcotics activity.  *Id.* at 338. The officers heard an argument between a man and a woman, *id.* at 340-42, and decided to enter Reyes' apartment without a warrant, *id.* at 491.

After they stepped inside the building, they discovered that the front door of the apartment was locked.  They also

[1] As noted below, we must, while reviewing a ruling on a motion to dismiss, view the facts in the light most favorable to the plaintiff.  Accordingly, without judging the facts, we recount them as set out in the amended complaint and the transcript of the suppression hearing referred to below.  Although Roman did not attach the transcript to the amended complaint, the Defendants included it in their motion to dismiss and told the District Court it was "capable of judicial notice" and "integral to the [c]omplaint."  App. at 130.  Thus we consider it at this stage.

In any event, both the amended complaint and transcript note that the officers forcibly entered the apartment, assaulted Roman, and falsely charged him with possession of a controlled substance.  *See* Am. Compl. ¶¶ 17, 22, 28.  Any minor differences in the two documents do not affect our analysis of his municipal liability claim.  *See infra* Section III.A (explaining that the events leading up to Roman's search and arrest are not relevant to the merits of his municipal liability claim).

noticed Melissa Isaksem, Reyes' friend, walking inside the building. *Id.* at 417-20. They stopped and questioned her. *Id.* at 417, 419. When she told them she was visiting Reyes, *id.* at 419, they ordered her to knock on the apartment door for them and threatened to arrest her if she did not comply, *id.* at 419-20. Isaksem led them to the apartment and stood directly in front of the peephole. *Id.* at 421. The police stood to her left, presumably out of the peephole's range. *Id.* An officer knocked on her behalf. *Id.* Reyes asked who was at the door, and Isaksem announced her presence. *Id.*

Reyes opened the door, expecting to see only Isaksem. *Id.* at 386, 400, 501. Instead, several officers rushed inside. *Id.* at 387, 400, 501. They handcuffed Roman, Reyes, and Isaksem, then demanded Roman "call someone to bring drugs to the [apartment]." Am. Compl. ¶ 30 (internal quotation marks omitted). If he did, they assured him they would "'make a deal' and 'let him go.'" *Id.* Roman refused the officers' demands, *id.* ¶ 33, and the police searched the apartment. Eventually they found drugs in a common-area space that was shared by multiple tenants and located in the back of the apartment. App. at 399, 479. After seizing the contraband, they yelled, "[W]e got you, motherfucker[;] . . . you're fucked now." *Id.* at 427. Officer Rodger Mendes walked back to Roman, "flipped him . . . on[]to his stomach . . . , put his knee in his neck[,] and . . . said he was going to get raped [in prison]." *Id.* at 428. Another officer informed Roman's father, who lived next door and observed parts of the search, that his son "would go away for a long time." *Id.* at 454.

Roman was arrested and imprisoned on the same night. The officers filed a criminal complaint against him for possession of, as well as intent to distribute, heroin and cocaine. A New Jersey grand jury returned a six-count indictment against him for the same offenses.

5

In response, Roman moved to suppress the evidence seized from the apartment. He argued the search was invalid under the Fourth Amendment because the contraband was not in plain view and thus a warrant was needed. The New Jersey Superior Court agreed. It concluded the plain-view exception did not apply and suppressed the contraband.

The State of New Jersey did not appeal the ruling and instead moved to dismiss the case. The Superior Court granted its motion in December 2014 and issued a final judgment of dismissal. Roman was released from prison during the same month.

Approximately a year later, Roman brought § 1983 and state-law tort claims against the City of Newark and various police officers (for simplicity, the City and the officers are jointly referred to as the "Defendants"). Among other things, he alleged the City had a custom or policy of unconstitutional searches, inadequate training, and poor supervision and discipline.[2] He also claimed the officers unlawfully searched his apartment and were liable for the torts of unlawful imprisonment and malicious prosecution.[3]

---

[2] Roman's amended complaint also included allegations of discrimination of national origin in violation of 42 U.S.C. § 1983, civil conspiracy in violation of 42 U.S.C. § 1985, conspiracy to commit an unlawful search in violation of the New Jersey Constitution and 42 U.S.C. § 1985, and conspiracy to commit unlawful imprisonment in violation of 42 U.S.C. § 1985. We do not address these claims, as Roman does not press them on appeal.

[3] We construe Roman's claim for unlawful imprisonment as a claim for false imprisonment. Although

6

The Defendants responded with a motion to dismiss. The District Court sided with them, dismissing the complaint in its entirety. It first addressed Roman's claim against the City and concluded the complaint "fail[ed] to plead . . . a custom or policy" of unlawful searches and a failure to train or supervise officers. *Roman v. City of Newark*, Civil Action No. 16-1110-SDW-LDW, 2017 WL 436251, at *4 (D.N.J. Jan. 30, 2017). Although the complaint alleged "a pattern or practice of constitutional violations in areas including stop[] and arrest practices, use of force, and theft by officers," the Court did not consider that sufficient to state a claim. *Id.* (internal quotation marks omitted) (quoting Compl. ¶ 59). Instead, it viewed those practices as predating Roman's arrest and observed that "the imposition of a [f]ederal [m]onitor indicate[d] [the City's] attempts to change any wrongful policies or practices." *Id.*

The Court also held the unlawful search claim was inadequately pled, as Roman did not "explain which [Defendant(s)] committed the allegedly wrongful acts" during the search and arrest. *Id.* Turning to the false imprisonment and malicious prosecution claims, it construed them as state-law claims and noted that plaintiffs must comply with the

New Jersey lacks a cause of action for "unlawful imprisonment," it has codified the elements of a false imprisonment claim. *See* N.J. Stat. Ann. § 2C:13-3; *Mallery v. Erie R. Co.*, 92 A. 371, 371 (N.J. 1914) ("This appeal brings up a judgment recovered by the respondent in an action for false imprisonment. The declaration described the unlawful imprisonment. . . ."); *see also* 8 American Law of Torts § 27:1 ("False imprisonment, sometimes called criminal restraint or unlawful imprisonment, is committed when a defendant so restrains another person as to interfere substantially with his liberty.").

New Jersey Tort Claims Act before bringing them against public entities. *See* N.J. Stat. Ann. § 59:8-1 *et seq.* Because the "[c]omplaint nowhere allege[d]" Roman complied with the Act's procedures, the Court dismissed those claims as well. *Roman*, 2017 WL 436251, at *6.

The Court's dismissal was without prejudice, and it granted Roman leave to amend. He did so by omitting his tort claims and retaining his other allegations in almost identical form. The Court dismissed his amended complaint and reaffirmed its ruling on reconsideration. This appeal followed.[4]

## II.    Jurisdiction and Standard of Review

The District Court had federal-question and supplemental jurisdiction per 28 U.S.C. §§ 1331 and 1367(a), respectively, and we have jurisdiction over its final orders under 28 U.S.C. § 1291.

We review *de novo* its dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). When conducting our review, "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks omitted). However, "we are not compelled to accept unsupported conclusions and unwarranted inferences . . . or a legal conclusion couched as a factual allegation[.]" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d

---

[4] Roman passed away while this appeal was pending, and his estate brings the claims on his behalf. We do not distinguish between Roman and his estate in this opinion.

8

Cir. 2007) (internal quotation marks omitted) (internal citation omitted).

## III. Discussion

### A. Roman sufficiently pled a municipal liability claim against Newark.

As noted, Roman alleges the City is liable under § 1983 because it "engaged in a pattern or practice of constitutional violations," "failed to properly train and/or supervise" its police force, and "failed to properly and adequately control and discipline" its police officers.[5] Am. Compl. ¶¶ 68, 73-74. Before discussing the merits of his claims, Roman directs our attention to the types of documents we may consider on a motion to dismiss. He contends we may review three sources that were provided to the District Court: an article published in the Newark *Star Ledger* (the "*Star Ledger* article"), a press release issued by the U.S. Attorney's Office (the "press release"), and a consent decree between the United States and the City of Newark (the "consent decree"). The *Star Ledger* article and press release were referenced in the amended complaint, *see id.* ¶¶ 68-69 (including hyperlinks to both), but the consent decree was attached to the Defendants' motion to dismiss, *see* App. at 129. Roman also asks us to look at one other document: the Department of Justice's Report on the investigation of the Newark Police Department (the "DOJ Report"). Although he

---

[5] Roman brings his municipal liability claims under § 1983 and the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-1 *et seq.* Because the latter "is interpreted analogously to . . . § 1983," we consider his New Jersey Civil Rights Act claims along with his § 1983 claim. *Coles v. Carlini*, 162 F. Supp. 3d 380, 404 (D.N.J. 2015).

9

acknowledges the DOJ Report was never provided to the District Court, he now claims it is integral to the pleadings.

Though the Defendants dispute that we may consider the DOJ Report, they add that we also cannot consider the consent decree because "no relevant provisions of [it] . . . were ever cited . . . to the District Court" and it is inadmissible settlement material. Defendants' Br. at 42. They assert as well, without any citation to the record, that Roman may not rely on the decree because he asked the District Court to confine its analysis to the pleadings.

We disagree with the Defendants' view of the consent decree. Although we examine the "complaint, exhibits attached to the complaint, [and] matters of public record," *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), we can also consider documents "that a defendant attaches as an exhibit to a motion to dismiss," *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), if they are "undisputedly authentic" and "the [plaintiff's] claims are based [on them]," *Mayer*, 605 F.3d at 230. That holding extends to settlement material because plaintiffs "need not provide admissible proof at th[e] [motion-to-dismiss] stage." *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 961 n.5 (N.D. Cal. 2014) (same). Moreover, the Supreme Court has been clear about the scope of our review, stating we "*must* consider the complaint in its entirety, as well as other sources [we] ordinarily examine when ruling on . . . motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (emphasis added).

10

Here, although the consent decree was not attached to Roman's amended complaint, we are free to review its contents for three reasons.[6] First, the Defendants attached the decree to their motion to dismiss and affirmed that it is "capable of judicial notice" as an indisputably authentic government document. App. at 129. Second, contrary to the dissent's assertion, the Defendants themselves argued (and correctly) before the District Court that Roman's claims were based on the consent decree. *Compare* Dissenting Op. at 5 ("What is crucial is whether Roman's complaint was 'based' on the consent decree."), *with* App. at 129 (filing from Defendants characterizing the consent decree as "integral to the Complaint"). Third, the amended complaint cited, and the District Court discussed, the DOJ investigation and federal monitor that eventually led to the consent decree. *See Roman*, 2017 WL 436251, at *4; *see also* Am. Compl. ¶¶ 68-71. Thus it was especially important for the Court to have considered the decree as well, given that it provides essential context to Roman's claims. That it did not was an abuse of discretion.

That said, we may not consider the DOJ Report at this stage because it was not provided to the District Court in the first instance by any party. Nor is it apparent that the Court considered it *sua sponte*. *See United States ex rel. Wilkins v.*

---

[6] Though the Defendants and our dissenting colleague do not challenge the *Star Ledger* article or the press release, we note that we consider them because they are referenced in the amended complaint. *See Tellabs*, 551 U.S. at 322. As Judge Jordan explains in his concurrence, however, Roman does not need either document or the suppression hearing transcript to state a municipal liability claim; the consent decree gives his allegations enough plausibility to survive dismissal.

11

*United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011) ("Though we do not doubt the authenticity of these documents, nevertheless we will not consider them because the parties did not present them to the District Court and we do not find any indication in the record that the Court considered them on its own initiative."). Hence it cannot carry any weight in our analysis.

Turning to the amended complaint, Roman claims the City is liable for his unlawful search because it "failed to train its officers in the use of search and seizure techniques, probable cause, and/or methods to properly obtain a search warrant." Am. Compl. ¶ 95. He alleges the Newark Police Department "engaged in a pattern or practice of constitutional violations" and asserts the Department of Justice appointed a federal monitor to oversee the reforms to which the City consented. *Id.* ¶ 68. His allegations also touch on the City's failure to "control and discipline" its police force, *id.* ¶ 74, and failure to "investigate . . . instances of . . . police misconduct," *id.* ¶ 81. He characterizes the City's practices in these areas as "tantamount to a[n] [unconstitutional] custom and/or policy," *id.* ¶ 82, thus indicating its "deliberate indifference to [its citizens' constitutional] rights," *id.* ¶ 83.

The Defendants respond that Roman has failed to allege a municipal liability claim, as no part of the *Star Ledger* article, press release, or consent decree references the types of constitutional violations pled in the amended complaint. They also contend the City had no notice "of any pattern of constitutional violations with respect to forced entry and searches of homes." Defendants' Br. at 50.

To plead a municipal liability claim, a plaintiff must allege that "a [local] government's policy or custom . . . inflict[ed] the injury" in question. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Policy is made when a

12

decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (alteration in original) (internal quotation marks omitted). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (Becker, J.); *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001) ("A custom . . . must have the force of law by virtue of the persistent practices of state [or municipal] officials." (internal quotation marks omitted)).

Although a policy or custom is necessary to plead a municipal claim, it is not sufficient to survive a motion to dismiss. A plaintiff must also allege that the policy or custom was the "proximate cause" of his injuries. *See Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996). He may do so by demonstrating an "affirmative link" between the policy or custom and the particular constitutional violation he alleges. *Bielevicz*, 915 F.2d at 850 (internal quotation marks omitted). This is done for a custom if Roman demonstrates that Newark had knowledge of "similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to [his] injury." *Id.* at 851. Despite these requirements, Roman does not need to identify a responsible decisionmaker in his pleadings. *See id.* at 850. Nor is he required to prove that the custom had the City's formal approval. *See Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986).

The pleading requirements are different for failure-to-train claims because a plaintiff need not allege an unconstitutional policy. *See Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("[I]n the absence of an

13

unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation . . . under § 1983."). Instead, he must demonstrate that a city's failure to train its employees "reflects a deliberate or conscious choice." *Brown*, 269 F.3d at 215 (internal quotation marks omitted). For claims involving police officers, the Supreme Court has held that the failure to train "serve[s] as [a] basis for § 1983 liability only where [it] . . . amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (footnote omitted). A plaintiff sufficiently pleads deliberate indifference by showing that "(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Doe v. Luzerne County*, 660 F.3d 169, 180 (3d Cir. 2011) (internal quotation marks omitted) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)).

In view of this case law, Roman has not pled a municipal policy, as his amended complaint fails to refer to "an official proclamation, policy, or [an] edict." *Andrews*, 895 F.2d at 1480. However, he has sufficiently alleged a custom of warrantless or nonconsensual searches. He has also adequately pled that the City failed to train, supervise, and discipline its police officers.[7]

---

[7] We consider allegations of failure to train, supervise, and discipline together because they fall under the same species of municipal liability. *See* Rosalie Berger Levinson, *Who Will Supervise the Supervisors? Establishing Liability for Failure to Train, Supervise, or Discipline in a Post-*

14

We start with Roman's allegations on municipal custom. He asserts the City had "a pattern or practice of constitutional violations in areas including . . . arrest practices." App. at 137. He further contends it had notice of this practice, as it received "complaints against officers accused of . . . conducting improper searches and false arrests." *Id.* at 134. The amended complaint, along with the press release and *Star Ledger* article, note that Newark was under the supervision of a federal monitor after Roman's arrest. Am. Compl. ¶ 68; App. at 133, 137. According to the press release, the monitor would oversee reforms in several areas, including searches, arrests, and the intake and investigation of misconduct complaints. App. at 137.

The consent decree echoes these points. It covers the same type of conduct Roman alleges, as it "prohibit[s] officers from relying on information known to be materially false or incorrect to justify a warrantless search . . . [or to] effect[] an arrest." *Id.* at 158; *see also id.* at 163 (mandating officers to collect data on consent, the type of search, and "a brief description of the facts creating probable cause"). The decree also requires the Police Department to investigate police misconduct, *see generally id.* at 184-92, with special emphasis on allegations of criminal misconduct, false arrest, planting evidence, and unlawful searches, *see id.* at 150, 186.

While the consent decree was not in place during Roman's search and arrest, we may fairly infer that the problems that led to it were occurring during the time of his allegations and for some time before that. *See id.* at 133-34 (noting the investigation that resulted in the consent decree and federal supervision began in May 2011 and ended in July 2014). With this mind, the decree fortifies Roman's

*Iqbal/Connick World*, 47 Harv. C.R.-C.L. L. Rev. 273, 280 (2012).

15

allegations of unlawful custom because it acknowledges "a pattern or practice of conduct by the Newark Police [Department] that deprives individuals of rights, privileges, and immunities secured by the Constitution." *Id.* at 144. When viewed in conjunction with the *Star Ledger* article, it references the types of constitutional violations mentioned in the amended complaint: warrantless searches, *id.* at 134, and false arrests, *id.* at 158. These violations were widespread and causally linked to Roman's alleged injury, as the Police Department was aware of them but "rare[ly] . . . acted" on citizen complaints. *Id.* at 134 (discussing complaints of "improper searches and false arrests"); *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) (noting the police department's failure to act on complaints "perpetuate[d] the City's custom of acquiescing in the excessive use of force by its police officers"). In light of these allegations, "it is logical to assume that [the City's] continued official tolerance of repeated misconduct facilitate[d] similar unlawful actions in the future," including the search and arrest of Roman. *Bielevicz*, 915 F.2d at 851. It follows that he has adequately pled a municipal custom and proximate causation under § 1983.

We reach the same conclusion with respect to Roman's failure-to-train, failure-to-supervise, and failure-to-discipline claims. To start, the *Star Ledger* article includes a statement on police training from James Stewart, Jr., the head of Newark's police union. He conceded the "last training [he] received" was in 1995, when he first joined the Newark Police Department. App. at 134 (internal quotation marks omitted). Moreover, Stewart is not some unreliable, rogue officer—he is the head of the police union. Nor is his experience isolated: the consent decree indicates Newark police officers in general were not trained on "the requirements of [the] Fourth Amendment and related law." *Id.* at 160 (discussing various Fourth Amendment doctrines

16

that should be included in police training, including "the difference[] . . . between voluntary consent and mere acquiescence to police authority"). The consent decree also touches on supervisory review of unlawful searches and arrests, requiring desk lieutenants and unit commanders to review "searches that appear to be without legal justification" and "arrests that are unsupported by probable cause." *Id.* at 161. Finally, it provides disciplinary measures for police officers who engage in "unlawful . . . searches" and "false arrests." *Id.* at 192. At the pleadings stage, a fair inference is that the consent decree was necessary because of Department-wide failures, not because one officer was last trained in 1995.

This is enough to prove municipal liability because the City "[knew] to a moral certainty" that its officers would need to conduct searches. *Harris*, 489 U.S. at 390 n.10. Yet in at least one instance it failed to provide training since 1995, *see* App. at 134, and per the decree its training did not cover the basics of the Fourth Amendment, *see id.* at 158-61. The City also did not discipline officers for "sustained allegations of misconduct," including "prior violations" and other "aggravating factors." *Id.* at 192-93. In view of these deficiencies, one could reasonably infer that the City's inaction "reflected [its] 'deliberate indifference'" to Roman's Fourth Amendment rights. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997); *cf. Harris*, 489 U.S. at 390 n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. . . . Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious' . . . that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." (internal citation omitted)). One could also infer that the City's failure to establish an adequate training program contributed to the specific constitutional violations alleged in

17

the amended complaint. *See Brown*, 520 U.S. at 409-10 ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights . . . may also support an inference of causation."); *cf. A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 582 (3d Cir. 2004) (reversing the District Court's grant of summary judgment in favor of a municipality because of "unrebutted testimony" that its juvenile detention center "did not have an adequate training program").

We conclude that the allegations regarding Newark's failure to train, supervise, and discipline are strong enough to survive a motion to dismiss. *See* Am. Compl. ¶¶ 63-98. Among them are: a failure to train officers on obtaining a search warrant, *id.* ¶ 67, and on "issuing truthful investigative reports," *id.* ¶ 77; a failure to supervise and manage officers, *id.* ¶¶ 67-68; and a failure to discipline officers, *id.* ¶ 74, first by "refus[ing]" to create a well-run Internal Affairs Department, *id.* ¶ 81, and second by "inadequately investigating, if investigating at all, citizens' complaints regarding illegal search and seizure, *id.* ¶ 84. The result was a "complete lack of accountability" and of "record keeping," *id.* ¶ 92, leading to a culture in which officers "knew there would be no professional consequences for their action[s]," *id.* ¶ 94. As the amended complaint alleges, it should come as no surprise that these conditions led to a federal investigation. *See id.* ¶ 89.

The dissent's attempt to distinguish the consent decree is unpersuasive. First, it misperceives the decree as concerning only police interactions with "pedestrians or the occupants of vehicles," not home searches. Dissenting Op. at 7 ("The consent decree says nothing about arrests and searches without consent that occur at residences . . ."). In fact, one concern of the decree was false arrests, *see* App. at

18

158, which can occur both at home and on the street. And the decree does concern home searches: it sets parameters officers must follow before searching "a home based upon consent." *Id.* Although Reyes by no means consented to the search here, she willingly opened her apartment door only because the police had used her friend Isaksem as a Trojan horse to gain entry.

Second, the dissent believes that the consent decree cannot help Roman's case because Roman was Hispanic. *See* Dissenting Op. at 7 ("[T]he decree addressed police practices that disparately impacted the black community. But that racial disparity did not apply to Roman, who was Hispanic."). To the contrary, the consent decree includes an entire section entitled "Bias-Free Policing," *see* App. at 165-67, that never restricts itself to bias against the black community. Instead, it provides that police officers must "operate without bias based on *any* demographic category," *id.* at 166 (emphasis added), and specifically forbids officers from discriminating based on "proxies for demographic category" such as "language ability," *id.* at 167. Plainly, the consent decree was meant to protect *all* Newark residents, including Hispanic residents.

Further, we find it difficult to square the dissent's reasoning with the record evidence discussing the City's troubling practices around the time of Roman's search and arrest. *See, e.g.*, *id.* at 134 (stating only one complaint out of 261 filed was sustained by department investigators); *id.* at 158 (prohibiting officers from relying on materially false information to justify a warrantless search); *id.* at 160 (requiring police officers to be trained on "the requirements of [the] Fourth Amendment and related law"); *id.* at 161 (mandating supervisory review of "searches that appear to be without legal justification" and "arrests that are unsupported by probable cause").

19

Unable to distinguish the consent decree outright, the dissent offers two narrow readings of the decree. First, it maintains that the decree can speak only to the Police Department's obligations going forward rather than shed any light whatsoever on the "status quo" within the Department before federal intervention. *See* Dissenting Op. at 10 (stating that the decree does not provide "any detail as to the status quo it addressed"). The dissent concedes that the DOJ probably did not enter into the consent decree because it was impressed with Newark's policing practices and wanted to encourage the City to keep up the good work. *Id.* At this stage, we must draw not only such obvious inferences, but also all reasonable ones, in favor of Roman. Thus we agree with the dissent on the "clear" difference between "agreeing to train more" (the consent decree on its face) and "agreeing that prior training was constitutionally inadequate" (the way in which the decree supports Roman's claims). *Id.* We simply believe that a reasonable inference bridges the gap in this case. Indeed, no inference is needed because Roman made the link explicit in the amended complaint. *See* Am. Compl. ¶ 89 (stating that the Police Department's "deliberate indifference to citizens' rights is what led to the imposition of a [f]ederal [m]onitor program . . . .").

Second, the dissent believes that the consent decree's training requirements, from which we can reasonably infer inadequate training before the decree, simply amount to "*additional* training" in, for instance, the requirements of the Fourth Amendment. Dissenting Op. at 10. To the contrary, the consent decree was meant to take the Newark Police Department back to basics: Do not lie on a warrant application or to justify a warrantless search, App. at 158; investigate police activities that appear to have lacked legal justification, *id.* at 161; and at all times follow the requirements of the Fourth Amendment, *id.* at 160.

20

The theme of the dissent appears to be that we are refashioning the amended complaint. It claims we are vacating the District Court's decision based on facts and arguments that were not presented to it. But as discussed above, we are engaged in *de novo* review of the adequacy of the amended complaint in light of documents that were before the District Court and that informed its allegations. *See supra* pp. 8-10. Additionally, and to repeat, the specific events leading up to Roman's search and arrest are not relevant to the merits of his municipal liability claim. Thus we are not vacating the Court's decision for excluding these facts from its analysis.

Rather, our focus is directed to Newark's practice at the time of Roman's search and arrest. The Court had notice of them, as it acknowledged that Roman alleged "a 'pattern or practice of constitutional violations in areas including stop[] and arrest practices, use of force, and theft by officers.'" *Roman*, 2017 WL 436251, at *4 (quoting Compl. ¶ 59). Nonetheless it dismissed the complaint and amended complaint because it viewed the City as attempting to change its practices. Even if the record can be read that way—and we doubt that[8]—the District Court's rationale has the wrong

---

[8] The record does not support the Court's inferences, as it tells us the DOJ's investigation was not completed until July 2014, *see* App. at 137; the Government did not solicit applications for a federal monitor until February 2015, *see id.*; and the consent decree was not final until May 2016, *see id.* at 215. By contrast, Roman was arrested in May 2014 and imprisoned until December of that year. As such, it is plausible that Newark's practices were ongoing when police officers searched and arrested him. It is also reasonable to infer that the City's corrective measures postdated the arrest.

focus. The question is not whether some evidence can be viewed as supporting the City. It is whether, viewing the pleadings and properly associated documents in the light most favorable to Roman, there are claims plausible enough to withstand a motion to dismiss. We think there is one—the municipal liability claim. And the Court did not have to look beyond the amended complaint and supporting documents to glean these facts.

In sum, Roman's municipal liability claim survives dismissal based on the record that was before the District Court. Because the Court reached the opposite conclusion, we part with its holding. Thus we vacate and remand this portion of its decision.

> **B.** **The District Court correctly dismissed the false imprisonment and malicious prosecution claims because they were not pled under § 1983.**

Roman alleges the Defendants are also liable for false imprisonment and malicious prosecution. As noted, the District Court construed these claims as state-law claims. It dismissed them because Roman did not comply with the New Jersey Tort Claims Act's procedural requirements for bringing claims against public entities and public employees. *See* N.J. Stat. Ann. § 59:8-1 *et seq.*

On appeal, Roman contends the Court erred in dismissing his claims because they were pled under § 1983. The Defendants counter that both claims were presented as

---

Hence we do not consider the City's corrective measures to be enough to defeat Roman's allegations.

22

state-law tort claims. They also point out that Roman omitted them from his amended complaint.[9]

As a preliminary matter, the Defendants correctly observe that false imprisonment and malicious prosecution are not in the amended complaint. Hence we must first decide if Roman has waived his right to challenge their dismissal on appeal. If we conclude that waiver does not apply, we then determine if the District Court correctly construed them as state-law tort claims.

We have not applied a strict rule in favor of waiver in this context. Instead, we have allowed "plaintiffs to appeal dismissals despite amended pleadings that omit the dismissed claim[,] *provided* repleading the particular cause of action would have been futile." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 516 (3d Cir. 2007) (emphasis in original) (footnote omitted). "Repleading is futile when the dismissal was 'on the merits.' A dismissal is on the merits when it is with prejudice or based on some legal barrier other than want of specificity or particularity." *Id.* If a court is uncertain, "doubt[] should be resolved *against* the party asserting waiver." *Id.* at 517 (emphasis in original).

_____

[9] At oral argument, Roman's counsel stated the false imprisonment claim was repled in Count 13 of the amended complaint even though that count alleges "*conspiracy* to commit unlawful imprisonment . . . [in violation of] 42 U.S.C. § 1985." App. at 278 (emphasis added); *see* Audio Recording of Oral Argument held June 12, 2018 at 11:39 to 12:06 (http://www2.ca3.uscourts.gov/oralargument/audio/17-2302TheEstateofAdrianoRomanJrvCityofNewarketal.mp3). We do not consider this contention, as it was raised for the first time at oral argument and thus is waived. *See In re Grand Jury*, 635 F.3d 101, 105 n.4 (3d Cir. 2011).

Here the District Court analyzed both claims on legal grounds. It observed that they were based on the New Jersey Tort Claims Act, which allows individuals to bring tort claims against public entities and employees after complying with certain procedural and notice requirements, *see Tripo v. Robert Wood Johnson Med. Ctr.*, 845 F. Supp. 2d 621, 626-27 (D.N.J. 2012) (summarizing the Act's procedures for suing a public entity or employee). It concluded Roman did not follow these requirements and thus dismissed the claims.

Although the Court was guided by procedural concerns, its dismissal was on the merits. The Tort Claims Act bars claims against public entities and employees if a plaintiff waits more than two years to file a "notice of claim." *See* N.J. Stat. Ann. § 59:8-8(b). The two-year mark is measured from the day the claim accrues (*i.e.*, the day on which the public entity or employee allegedly harmed the plaintiff). In our case, because Roman's claims accrued in May 2014, he had until May 2016 to file a notice of claim. As the Court noted, however, he did not file any type of notice during the two-year period. *See Roman*, 2017 WL 436251, at *6 (observing that, as of January 31, 2017, the date on which the Court dismissed the complaint, Roman had not filed a notice). Thus Roman's procedural error morphed into a dismissal on the merits, *see* N.J. Stat. Ann. § 59:8-8(b) ("The claimant shall be forever barred from recovering against a public entity or public employee if . . . [t]wo years have elapsed since the accrual of the claim."), and he may appeal the District Court's decision on his false imprisonment and malicious prosecution claims, *see Atkinson*, 473 F.3d at 516-17.

In light of this conclusion, we must focus on the pleadings and decide if Roman's claims are based on § 1983. If we look to the complaint, it suggests both false imprisonment and malicious prosecution are state-law tort

24

claims. It never identifies them as § 1983 or federal claims. Rather, it presents them generically, following a series of other state-law tort claims. *See, e.g.,* App. at 44 ("intentional infliction of emotional distress"); *id.* at 46 ("negligent infliction of emotional distress"); *id.* at 47 ("assault and battery"); *id.* at 49 ("unlawful imprisonment"); *id.* at 51 ("malicious prosecution"). This indicates to us that Roman pled both claims as state-law claims, not federal claims. While the unlawful (*i.e.*, false) imprisonment claim does note that the Defendants "restrict[ed] [Roman's] constitutionally guaranteed rights of liberty and freedom of movement," it is silent as to whether it refers to the United States or New Jersey Constitution. Compl. ¶ 114. This is too facile to imply the former when but a few identifying words would do. The default is New Jersey law, which defines false imprisonment as "an[y] unlawful restraint that interferes with a victim's liberty" and requires "[n]o further wrongful purpose" for a *prima facie* showing. *State v. Savage*, 799 A.2d 477, 494 (N.J. 2009).

Accordingly, the District Court correctly construed the false imprisonment and malicious prosecution claims as state-law tort claims, and we affirm this portion of its holding.[10]

**C.    The doctrines of *res judicata*, collateral estoppel, and judicial estoppel do not require us to dismiss Roman's § 1983 claims.**

Finally, the Defendants invoke the doctrines of *res judicata*, collateral estoppel, and judicial estoppel. According

---

[10] We also affirm the dismissal of Roman's unlawful-search claims because they were not adequately pled. We do not opine on whether a plaintiff may allege joint and several liability in connection with an unlawful-search claim.

25

to them, each doctrine compels us to dismiss Roman's § 1983 claims.

We start with *res judicata*. The Defendants contend it bars Roman's claims because "the criminal matter and the suppression hearing were based on the exact same facts" as those alleged in Roman's pleadings. Defendants' Br. at 64. In their view, criminal proceedings are enough to preclude a *civil* suit seeking damages under § 1983.

We disagree. "A party seeking to invoke *res judicata* must establish three elements: (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Duhaney v. Att'y Gen.*, 621 F.3d 340, 347 (3d Cir. 2010) (internal quotation marks omitted). Roman's suit is not based on the same cause of action as the criminal complaint and suppression hearing. Nor are his current claims of the type "that could have been brought" in the earlier criminal proceeding. *Id.* (internal quotation marks omitted); *see also Helvering v. Mitchell*, 303 U.S. 391, 397 (1938) ("The difference in degree of the burden of proof in criminal and civil cases precludes application of the doctrine of *res judicata*."). New Jersey initiated the criminal case. Roman was not at liberty to assert any claims except for defenses against the prosecution's case-in-chief. *See Leather v. Eyck*, 180 F.3d 420, 425 (2d Cir. 1999) ("[B]ecause the nature of the prior state[-]court proceeding was such that [the Appellant] could not have sought damages for his alleged constitutional injuries (while defending himself on [a criminal] charge . . . ), *res judicata* does not bar his federal § 1983 suit for damages."). Moreover, he was not free to raise his § 1983 claims in the same criminal case; indeed, he could not bring them until the criminal proceeding concluded. *See Heck v. Humphrey*, 512 U.S. 477, 486 (1994) ("[T]he . . . principle that civil tort actions are not appropriate vehicles for

26

challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement. . . .”). Accordingly, *res judicata* does not bar Roman's claims.

Moving on to collateral estoppel, the Defendants argue it (1) absolves Officer Mendes of liability because the Superior Court made a factual finding that Roman possessed the contraband that was seized from the apartment, (2) absolves Sergeant Joyce Hill because nothing in the Superior Court's transcript indicates she was present for the search and arrest, and (3) absolves the other named defendants because the Superior Court's transcript suggests they only handled the contraband. According to the Defendants, the Superior Court decided all of these issues in their favor during the suppression hearing. *See Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 505 (3d Cir. 1992) (stating a party is collaterally estopped from litigating a specific issue if, among other things, “[an] identical issue was decided in a prior adjudication”). Again we disagree. Contrary to the Defendants' assertions, the Superior Court never decided any of these issues during the suppression hearing. While it did find that Roman had a possessory interest in the apartment, that is not enough for us to conclude that he had actual or constructive possession over the contraband. Collateral estoppel is not appropriate in this context.

Last, the Defendants assert that judicial estoppel precludes Roman's claims because he admitted that (1) drugs were found in the apartment, (2) he had a possessory interest in the apartment, (3) Officer Mendes was the only officer who initiated the prosecution, and (4) the remaining officers only handled the contraband and had no other roles. They insist these concessions “are sufficient to establish that [Roman's]

arrest and prosecution arise out of his possession of incriminating evidence[.]" Defendants' Br. at 65. As noted, "[j]udicial estoppel, sometimes called the 'doctrine against the assertion of inconsistent positions,' is a judge-made doctrine that . . . prevent[s] a litigant from asserting a position inconsistent with one that []he has previously asserted . . . in a previous proceeding." *Ryan Operations G.P.*, 81 F.3d at 358. This doctrine is not in play here, as Roman never stipulated that Officer Mendes was the only officer to bring the prosecution or that the remaining officers only handled the contraband. While the Court found that Roman had a possessory interest in the apartment, that interest (we repeat) is not enough to establish that he possessed the contraband. Accordingly, judicial estoppel does not require us to dismiss Roman's claims.

\*　　\*　　\*　　\*　　\*

Roman has sufficiently alleged a municipal liability claim against the City of Newark under § 1983. He cites various examples of inadequate police training, poor police discipline, and unheeded citizen complaints. He tells us certain police officers did not receive training for over 20 years, and their training did not cover the basic requirements of the Fourth Amendment. In his pleadings, he states the Newark Police Department did not discipline officers who engaged in police misconduct, Am. Compl. ¶¶ 84-86, including unlawful searches and false arrests, App. at 134. He also notes the public filed formal complaints about improper searches and false arrests that were disregarded almost wholesale. *Id.* These alleged practices were ongoing when Roman's search and arrest occurred, and the City had notice of them at that time. While the proof developed to support these allegations may or may not be persuasive to a finder of fact, they are enough to survive dismissal at this stage. Based on this conclusion, we part with the District

28

Court's holding that Roman failed to state a § 1983 claim against the City. Though we affirm otherwise, we vacate and remand its decision on municipal liability.

JORDAN, *Circuit Judge*, *concurring*.

I join the majority opinion and write separately only to note that, even if we were to ignore the suppression hearing transcript and the press release and the *Star Ledger* article, there is still a sound basis to conclude that Roman has stated plausible claims for municipal liability. Our panel is united in understanding that we can properly consider the consent decree because it was provided to the District Court and was referenced and relied upon in Roman's amended complaint. Those two sources – the consent decree and the amended complaint – are sufficient to overcome the motion to dismiss the claims against the City of Newark.

The consent decree supports the allegations in the amended complaint in a number of respects. For example, it expressly prohibits Newark Police officers "from relying on information known to be materially false or incorrect to justify a warrantless search or to seek a search warrant[.]" (App. at 158). A fair inference from that prohibition is that it was needed precisely because the police were often relying on false information to justify warrantless searches. That inference bolsters Roman's allegation that "[n]o drugs were found in [his] possession" and yet the police "arrested [him] and falsely charged him with possession of a controlled dangerous substance[.]" (App. at 263 ¶¶ 28-29).

In another instance, the consent decree suggests that there has been a lack of training and supervision in the Newark Police Department. To remedy that deficiency, the consent decree requires the Department to "provide all officers with at least 16 hours of training on stops, searches, arrests, ... [and]

1

training ... in ... Fourth Amendment issues" as well as mandating "desk lieutenant[s] or unit commander[s] [to] review each arrest report by officers under their command[.]" (App. at 159-61). The inference that there was inadequate training supports Roman's allegation that the Department's officers, "through their actions, inactions, course of conduct, poor or non-existent training and deficient supervision[,] caused ... [the] illegal deprivation of [his] liberty[.]" (App. at 265 ¶ 48).

As a final example, the consent decree says that the Department must "conduct integrity audits and compliance reviews to identify and investigate all officers who have engaged in misconduct including unlawful ... searches[] and seizures[.]" (App. at 192). The need for such audits and reviews lends plausibility to Roman's allegation that the "City had a custom and practice of inadequately investigating ... citizens' complaints regarding illegal search and seizure[.]" (App. at 272 ¶ 84).

Thus, looking only at the amended complaint together with the consent decree, and giving Roman the benefit of all favorable inferences, as we must at this stage, there is a sufficient basis to say that Roman has stated plausible claims for municipal liability under 42 U.S.C. § 1983. Dismissal of those claims was therefore an error.

2

HARDIMAN, *Circuit Judge*, concurring in part and dissenting in part.

The District Court dismissed Roman's case after giving him two opportunities to state a claim upon which relief may be granted and after reconsidering its order of dismissal. Based on the record presented to it, the District Court's decision was correct and should be affirmed as to all but one of Roman's claims (the municipal liability claim for failure to train, supervise, or discipline).

The Majority vacates part of the District Court's judgment by reciting facts found nowhere in Roman's amended complaint and by adding facts of its own creation that were neither pleaded nor argued to the District Court with sufficient specificity. The Majority's deviation from standard civil practice and procedure compels this partial dissent.

I

This dissent results principally from a disagreement with my colleagues about which facts were properly before the District Court. First, the Majority proffers a narrative that Roman never gave the District Court and which has no relevance to the claims it revives. This Court need not (and should not) recite these "facts" and "background" as true. Second, Roman did not sufficiently plead a municipal liability claim based on Newark's alleged pattern or practice of Fourth Amendment violations. If the facts as pleaded (or subject to judicial notice) were as the Majority recites them, I would agree that Roman stated a claim for relief. But since the actual facts before the District Court were quite different from those enunciated by the Majority, the District Court did not err by dismissing this claim.

1

Despite these disagreements with my colleagues, I agree with them that Roman's amended complaint sufficiently stated a municipal liability claim for failure to train, supervise, or discipline. Yet I cannot agree with their reasoning *in toto* because we should not extrapolate—and the District Court did not err by declining to extrapolate—from extraneous documents (like the consent decree Roman never provided nor cited to the District Court) to reach that conclusion. This single claim should be resuscitated, but only based on the face of the amended complaint.

A

The Majority purports to recount the facts of this case "as set out in the amended complaint and the transcript of the [state court] suppression hearing." Maj. Op. 4 n.1. Yet precious few of those facts were actually pleaded, primarily because the state court transcript was not proffered to the District Court by Roman. Moreover, the Majority's narrative of Roman's alleged mistreatment has effectively no bearing on the municipal liability claims it revives.

The lion's share of the troubling facts recited by the Majority were taken from sources other than Roman's amended complaint. Those sources—including the state-court proceedings and subsequent briefs—paint a picture the District Court never observed while considering the motion to dismiss. In truth, the amended complaint says nothing about how the investigation began, or the surveillance of Roman's apartment, or the initial interaction between police and Melissa Isaksem, or the officers' use of Isaksem as a decoy to gain entry into the apartment, or the fact that drugs were seized from a common area, or the expletives and threats that specific officers yelled at both Roman and his father, or Officer Mendes's use of

2

physical force. Unlike those graphic and specific facts the Majority extracts, the amended complaint is replete with conclusory and generalized assertions. *See* App. 261–63.

Here are some examples of the Majority's approach: Instead of averring that Officer Mendes flipped Roman on his stomach and put a knee in Roman's neck, Maj. Op. 5, the amended complaint merely states that "[t]he Defendant Officers and Defendant John Does 1–20 (fictitious names) illegally assaulted the Plaintiff, throwing him against a wall and handcuffing him," App. 262. And rather than recounting a detailed plan to initiate an illegal search that included using an unwitting friend as a decoy, Maj. Op. 5, the amended complaint states only that "'Defendant Officers' . . . and Defendant John Does 1–20 (fictitious names), after having the opportunity to observe that the Plaintiff was a person of Latino descent, initiated an illegal search and seizure of the Plaintiff's residence," App. 261.

Now on appeal, for the first time Roman cites facts establishing how the police gained entry into the apartment, the threatening words they spoke, and the actions of Officer Mendes. Roman Br. 10–12. We should not endorse this unpleaded narrative, nor suggest the District Court erred by failing to manufacture it in the first place.

B

The Majority concludes that Roman's amended complaint (supplemented by the consent decree, a news article, and a press release) contains enough facts to make plausible his claims that his injuries were proximately caused by Newark's: (1) pattern or practice of constitutional violations in the area of arrest practices; and (2) failure to adequately train,

3

supervise, or discipline its officers. Maj. Op. 15–16. The first conclusion is unwarranted. And while the second conclusion is correct, the Majority still errs in its reliance on a document Roman never cited and inferential leaps that Roman's pleadings themselves do not admit.

1

On its face, the amended complaint contains very few facts related to Roman's arrest or Newark's alleged pattern or practice of rights violations, and what it does contain amount only to conclusory statements. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting that a court's duty to "accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). When we excise from the Majority's narrative all facts that were neither pleaded nor presented to the District Court and the complaints' legal conclusions, it becomes clear that the District Court did not err by twice deeming Roman's complaint deficient regarding a pattern or practice of rights violations.

This Court should not fault the trial judge for failing to take cognizance of facts or arguments never presented to her, especially here, where Roman chose not to include in his amended pleading facts that could have been gleaned from Defendants' first motion to dismiss and the consent decree attached to it. *See Snyder v. Pascack Valley Hosp.*, 303 F.3d 271, 276 (3d Cir. 2002) (noting that "[a]n amended complaint supercedes the original version in providing the blueprint for the future course of a lawsuit").

4

The Majority primarily (and incorrectly) relies on that consent decree to buttress Roman's pattern-or-practice claim. Although the District Court could take notice of the consent decree's existence, it's quite another matter to hold it accountable for not accepting as true everything its contents could possibly imply—especially when Roman neither pleaded nor relied upon the decree's contents.

What is crucial is whether Roman's complaint was "based" on the consent decree.[1] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Only to the extent the Majority refashions Roman's pattern-or-practice claim such that it is *now* based on implausible inferences from the consent decree is it "based on" the consent decree. For Roman did not explicitly reference, quote, or rely on the document in his amended complaint—even after the City provided it. The amended complaint merely references the decree's announcement by the Department of Justice months after his arrest.[2] *See* App. 270 ¶ 68. The District Court, though it must draw all *reasonable* inferences in Roman's favor, had no obligation to abstract facts or inferences or claims Roman

---

[1] His appellate briefs' references to the document are not determinative, no matter how many times they cite the decree.

[2] This timing further complicates the Majority's reliance on the consent decree. The decree's announcement months after Roman's arrest requires yet another "infer[ence] that the problems that led to it were occurring during the time of his allegations and for some time before that." Maj. Op. 15. It also requires an inference that all of the City's "corrective measures postdated the arrest." *Id.* at 21 n.8.

chose not to plead.[3] Instead, he was the master of his own complaint. *See Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 505 (3d Cir. 2014).

And even if we accept as true all the consent decree contains, Roman's arrest was not plausibly part of the pattern or practice of rights violations the decree addressed, except perhaps at the highest level of generality.[4] For starters, the decree addressed police stops and arrests of pedestrians or the occupants of vehicles. *See* App. 79 (detailing the pattern or practice investigated by the DOJ that led to the consent

---

[3] The document's undisputed authenticity as a government document says nothing about the reasonableness of the inferences the Majority abstracts from the consent decree. Nor does it speak to the contents' relevance to Roman's case. Such authenticity merely provides one reason for judicially noticing the decree's existence and eliminates one potential reason for *not* relying on it. It does not follow that it is "especially important" for district courts to rely on and extrapolate from such documents. Maj. Op. 11.

[4] The consent decree itself admits no specific pattern or practice of rights violations. Although it followed a DOJ report that "revealed a pattern or practice of constitutional violations in areas including stop and arrest practices, use of force, and theft by officers," that report was never provided to the District Court. App. 137; *see* Maj. Op. 11–12. Instead, the consent decree only outlines measures Newark agreed to take—not any pattern or practice of rights violations, let alone one that plausibly caused Roman's injuries. In fact, that report actually demonstrates that even the pattern or practice that led to the consent decree could *not* plausibly have caused Roman's injuries.

6

decree's adoption). The consent decree says nothing about arrests or searches without consent that occur at residences, which is what Roman complains of in this case.

Another problem that distinguishes Roman's complaint from the problems that led to the consent decree is the fact that the decree addressed police practices that disparately impacted the black community. *See* App. 93–98 (detailing same).[5] But that racial disparity did not apply to Roman, who was Hispanic. *See* App. 261 ¶ 16. While the consent decree may have been "meant to protect *all* Newark residents," Maj. Op. 19, the point remains that the pattern or practice giving rise to it was not one that plausibly caused Roman's injuries.

Finally, the consent decree addressed erroneous narcotics arrest reports where "individuals often were purportedly seated in cars holding clear plastic baggies in front of them or on their laps and officers could 'immediately' see the contraband, even though the report indicated that the subject's back was to an officer, or that the officer had not yet approached the car." App. 92 (detailing the pattern or practice investigated by the DOJ that led to the consent decree's adoption). Wholly unrelated to those erroneous reports, Roman alleges that officers exhaustively searched the apartment

---

[5] In his motion for reconsideration, Roman claimed his municipal liability argument was based on "the City's widespread and systemic misuse of police powers to treat members of a protected racial class different from those of white citizens." ECF 43-3 at 8. Unlike the pattern or practice of Fourth Amendment violations the Majority now remands, he argued "racial profiling, racial discrimination, or other widespread discrimination of minorities" gave rise to his municipal liability cause of action. *Id.*

7

without a warrant, and he is silent as to where and when the officers found the drugs. *See* App. 30–31, 262–63.

In sum, Roman's arrest was too dissimilar from the pattern or practice addressed by the consent decree to plausibly allege proximate causation for his injuries. While clear that the DOJ did not enter into the consent decree "because it was impressed with Newark's policing practices," Maj. Op. 20, it was not the District Court's duty to imagine all possible inferences from the document. It was Roman's duty to plead them. *See Judon*, 773 F.3d at 505. For the Majority to conclude otherwise, it must derive that pattern or practice from sources not before the District Court and define it at the highest level of generality: Fourth Amendment violations writ large. In other words, my colleagues conclude that because Newark police allegedly engaged in a pattern or practice of Fourth Amendment violations of type $x$, it follows that they plausibly committed this violation of type $y$—all based on a document they cannot claim the District Court *must* have considered. The District Court did not err in failing to perform the Majority's inferential leaps to reach that conclusion based on a document it need not have considered in the first place. It properly dismissed this claim rather than indulge such speculation. *See Iqbal*, 556 U.S. at 679–80.

With or without these sources, the amended complaint's bare legal conclusions need not be accepted as true. *Id.* at 678. So Roman failed to state a pattern-or-practice claim on which relief could be granted.

Roman's failure-to-train, failure-to-supervise, and failure-to-discipline claim was sufficiently pleaded. But the Majority's method for arriving at this conclusion suffers from similar deficiencies to its pattern-or-practice reasoning. The Majority's reliance on the consent decree is again misplaced for the reasons discussed above.[6] And even if such reliance were appropriate, the consent decree does not make Roman's claim plausible.

Roman's arrest was not plausibly caused by the failures to train, supervise, or discipline Newark officers the Majority cites in the consent decree because no such failures appear in the document. The Majority claims "the consent decree indicates Newark police officers were not trained on 'the requirements of [the] Fourth Amendment and related law.'" Maj. Op. 16. And "per the decree" the City's "training did not cover the basics of the Fourth Amendment." *Id.* at 17. It does no such thing. Rather, it indicates that Newark agreed to

---

[6] The Majority's reliance on the news article and press release hyperlinked in Roman's complaints is likewise inappropriate. The news article's identification of one officer—who may or may not have been involved in Roman's arrest—who told a reporter he "*think*[*s*]" he did not receive training for 20 years is not enough to subject the City to liability for failure to adequately train its entire police force. App. 134 (emphasis added). This demonstrates no custom; nor does it plausibly demonstrate the police academy training all officers receive was constitutionally inadequate without more follow-up. Nor does the article address supervision or discipline. Similarly, the press release addresses none of the three.

implement *additional* training on "the requirements of [the] Fourth Amendment and related law" without any detail as to the status quo it addressed. App. 160. While it's safe to say that the DOJ did not endorse that status quo, the difference between agreeing to train more and agreeing that prior training was constitutionally inadequate regarding the Fourth Amendment writ large should be clear. And, as discussed above, the consent decree arose from a host of policing practices unlike those Roman alleged (except at the highest level of generality). Newark could not plausibly have agreed to the extraordinary liability that would come from admitting that its police training violated the Fourth Amendment in every instance, or in every instance possibly connected to Roman's arrest. Indeed, the decree says no such thing about *any* instance.

The consent decree is even thinner as it relates to supervisory and disciplinary issues. From the City's agreement to adhere to certain review processes and disciplinary measures regarding unlawful searches and false arrests, the Majority perceives a "deliberate indifference to Roman's Fourth Amendment rights." Maj. Op. 17 (internal quotations and citation omitted). That does not follow. The decree does not describe or admit any processes or measures already in place or any existing pattern of unlawful searches or false arrests.

Instead, Roman's amended complaint directly alleged training, supervision, and discipline problems with adequate specificity to survive a motion to dismiss. *See, e.g.*, App. 270–72 ¶¶ 68, 70, 71, 78, 80, 82; *see also Doe v. Luzerne Cty.*, 660 F.3d 169, 179–80 (3d Cir. 2011) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir.1999)) (detailing standard at summary judgment for failure-to-train claim). The Majority's improper reliance on the consent decree and inferential leaps

from that and other sources outside the amended complaint are, in my view, erroneous and unnecessary.

\* \* \*

As we have noted many times before, we are a court of review, not a court of first view. *See, e.g.*, *In Re: J & S Props., LLC*, 872 F.3d 138, 148 (3d Cir. 2017). Our review is based on the record as presented by counsel in our adversary system. We should not fault the District Court for failing to manufacture facts and craft arguments that Roman neglected to plead. By conjuring its own facts repackaged as if pleaded in the amended complaint, the Majority imposes a new duty upon district judges within the Third Circuit. It does so without citing precedent for the proposition that a district court *must* consider facts and arguments never pleaded or argued by the plaintiff. I cannot subscribe to this new rule.

This appeal implicates a fundamental legal principle: the plaintiff is the master of his complaint. Because of that time-honored principle, Roman's failure to state a policy-or-practice claim upon which relief may be granted requires the harsh sanction of dismissal. After his initial complaint was found inadequate, Roman failed to file an amended complaint that cured the deficiencies identified by the District Court. Even assuming Roman might have had a legitimate claim, it would have been improper for the District Court to try to make Roman's case for him. And it's especially inappropriate for us to overrule the decision of a district judge because of a failure to apprehend facts and arguments never presented to her. I respectfully dissent.

11